# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEIL HAROLDSON and AARON SCHIRO, individually and on behalf of all others similarly situated, | No. |
| Plaintiffs, | **PLAINTIFFS' CLASS ACTION COMPLAINT AND JURY DEMAND** |
| -v- | |
| DRAFTKINGS, INC. Defendant, | |

Plaintiffs Neil Haroldson and Aaron Schiro, on behalf of themselves and all others similarly situated, by and through their counsel, bring this action against Draftkings, Inc. ("Defendant") and allege, upon personal knowledge as to their own actions and their counsel's investigations, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.    This action arises out of Plaintiffs' use of Defendant's online service which allows players to risk their own money in competitions wherein they assemble rosters of real-world athletes.

2.    Defendant purports to offer games of skill, but has actually allowed the use of inside information to destroy the notion of fairness in its contests.

3.    Plaintiffs bring this action on behalf of themselves and on behalf of two classes of Defendant's customers who are the victims of Defendant's unfair contests, to recover losses incurred due to Defendant's practices.

1

## PARTIES

4.     Plaintiff Neil Haroldson is an individual, a resident of Saint Cloud, Minnesota, and a citizen of the State of Minnesota. Mr. Haroldson deposited money into  Defendant's website and participated in Defendant's contests by wagering that money.

5.     Plaintiff Aaron Schiro is an individual, a resident of Atwater, Minnesota, and a citizen of the State of Minnesota. Mr. Schiro deposited money into  Defendant's website and participated in Defendant's contests by wagering that money.

6.     Defendant DraftKings is a Delaware Corporation with its principal place of business at 125 Summer Street, Boston, Massachusetts 02110. For jurisdictional purposes, Defendant is a citizen of Delaware and Massachusetts.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d). The aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs. This is a class action in which more than two-third of the proposed plaintiff classes, on one hand, and Defendant, on the other, are citizens of different states. There are at least thousands of Plaintiffs in each proposed class.

8.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(1) and (2) as Defendant's headquarters are in this district and a substantial part of the events or omissions giving rise to the claims in this action occurred in this district.

9.     The unlawful practices alleged herein were conceived, reviewed, approved and otherwise controlled from Defendant's headquarters in Boston.

## FACTUAL ALLEGATIONS

10.     The past several years have seen the growth of Fantasy Sports, wherein sports fans can participate in competitions based on the real world performances of professional and collegiate athletes.

11.     Traditionally, Fantasy Sports were engaged in by small groups of 8 to 14 friends who each drafted and maintained their own roster of real-world athletes. In these games, "owners" accumulate points based on the real world performances of "their" athletes.

12.     Fantasy Sports allow sports fans to simulate the experience of running a major sports franchise, while providing an added interest in real world sports contests.

13.     Fantasy Sports leagues typically last approximately the length of a single season of the sport that is being simulated.

14.     More recently, a number of online platforms have been created to allow players to participate in games that are similar to Fantasy Sports. These "Daily Fantasy Sports" ('DFS") platforms offer games that take place within a few days and are largely played against strangers. They differ from traditional fantasy sports in that the platforms collect money from participants and pay money to some of the games' winners.

15.     Defendant operates a platform whereby customers, including Plaintiffs, are offered DFS "games of skill."

16.     Defendant's entire platform is based on the premise that it offers fair games in which the outcome is the result of participants' skill. The legality of DraftKings depends on its classification as a game of skill under the Unlawful Internet Gambling Enforcement Act, 31 U.S.C. § 5361 *et seq.*

17.     Defendant's assertions that it offers games of skill are ubiquitous. For example, Defendant's website contains the following representation:

Similarly, Defendant's website notes that "We are a US-based skill games company," "Contests offered on this Website are contests of skill," and "*From all entries received for each Contest, winners are determined by the individuals who use their skill and knowledge of relevant sports information and fantasy sports rules to accumulate the most points according to the corresponding scoring rules*."[2, 3]

18.     Defendant's advertisements have been ubiquitous since the start of the 2015 NFL season. These advertisements repeatedly represented Defendant's contests as games of skill, whereby skill made the difference between winning and losing.

19.     DFS has grown to become an enormous industry, spawning massive advertising campaigns and obtaining investments from major sports leagues. The rapid growth continues to accelerate. According to Defendant's CEO, DraftKings acquired nine times as many customers in September 2015 as it did in September 2014.[4]

20.     Defendant is one of two companies that transact the overwhelming majority of business in the DFS industry. According to Defendant's CEO, Defendant and its largest competitor, FanDuel, collectively control over 90% of the DFS market.[5]

---

[1] https://www.draftkings.com/help/why-is-it-legal (last accessed Oct. 15, 2015).

[2] https://www.draftkings.com/help/faq(last accessed Oct. 15, 2015).

[3]https://www.draftkings.com/help/terms (last accessed Oct. 15, 2015).

[4] http://fortune.com/2015/10/08/draftkings-ceo-discusses-scandal/ (last accessed Oct. 15, 2015).

[5] http://fortune.com/2015/10/08/draftkings-ceo-discusses-scandal/ (last accessed Oct. 15, 2015).

21.     Unlike traditional Fantasy Sports, DFS platforms like Defendant's allow multiple participants in the same game to draft the same players. Each player is assigned a salary value, and each team must not exceed the salary cap.

22.     Defendant offers contests in different sports and formats. Some formats involve as few as two participants competing directly against one another for a high score (and a portion of the other participant's entry fee).

23.     Defendant's largest games come in a format known as "Guaranteed Prize Pool" ("GPP"). In this format, the total prize money is guaranteed before the number of entrants are known, which is a requirement in order to maintain the game's legality.

24.     GPP games pay out a fixed amount of money to a fixed number of the participants who accumulate the highest point totals in a given competition.

25.     Because GPP participants are playing against a large field of players, winning strategy does not simply involve selecting the players who are most likely to produce the best statistics and therefore the most points. Game theory is also used to obtain an advantage.

26.     Participants can gain an edge by selecting players with a low usage rate, meaning a player that few other participants have "drafted." This is because if that player scores well in a given week, less participants will receive the benefit of those points. Utilizing players with a low usage rate means that in the event that those players are successful, there will be less competition among participants in contention for prize money. This concept is known as utilizing "implied odds."

27.     The possession of information regarding players' usage rates therefore provides an enormous advantage to a participant. Because of this, DFS providers generally do not make

usage rates public until after a given competition has "locked," or ceased to allow new or modified entries.

28.     Some DFS platforms, like Defendant's chief competitor FanDuel, completely lock the rosters of participants as soon as the first real-world game on which the statistics are based has begun. Defendant's platform allows players to "swap" players out until that player's game has actually begun. For example, where a FanDuel contest would "lock" at 1 p.m. EST at the beginning of the first NFL game on a given Sunday, Defendant's platform would allow participants to "swap" players whose games had not yet begun. As a reference, the NFL typically starts a number of games at 1 p.m. EST, followed by several more around 4 p.m. EST, one Sunday night, and one Monday night.

29.     In an effort to collect more revenue, Defendant publishes various literature on DFS strategy. This often includes, *after* a given set of games has finished, publishing the usage rates of various players in its contests.

30.     A number of Defendant's employees, like those of its competitors, have access to an overwhelming volume of non-public, real-time data regarding the lineups being utilized on its website and the usage rates of each player.

31.     During its games in week 3 of the 2015 NFL season, Defendant's employee mistakenly tweeted out player usage rates for Defendant's largest weekly GPP tournament well before the 4 p.m. EST slate of games had even begun.

32.     This error meant that many participants in Defendant's week 3 NFL contests gained access to confidential, inside information that conferred a competitive advantage upon them. This information was made available while participants could still make changes to their rosters.

33.     Defendant's week 3 NFL contests were therefore irreparably jeopardized and inherently unfair. Defendant, however, did not cancel the contests or refund participants' entry fees.

34.     This error set off a firestorm, as the same employee won $350,000 for taking second place in one of FanDuel's largest tournaments of the same week. Suspicions immediately arose that the employee had used inside information from Defendant to obtain an unfair advantage on FanDuel.

35.     As controversy ensued regarding DFS employees having access to inside information while participating in DFS contests on other DFS platforms, it became clear that employees of Defendant's competitor(s) have enjoyed uncanny success on Defendant's platform. This success appeared to date back to the time said employees began their employment with Defendant's competitor(s).

36.     For example, one of FanDuel's employees, Matthew Boccio, is ranked as one of the top 50 players in all of DFS, despite only playing on Defendant's platform. He is involved in setting player prices at FanDuel, and at the same time was enjoying great success in Defendant's contests under the screen name "PetrGibbons."[6]

37.     Just as many users had access to inside information regarding Defendant's week 3 NFL contests, Defendant has allowed its competitors' employees to participate in its contests with inside information gained through their employment. As a result, a large number of the contests Defendant has offered as "games of skill" have actually offered unfair advantages to insiders.

---

[6] https://dfsreport.com/6898/follow-up-to-draftkings-fanduel-mishaps/(last accessed Oct. 15, 2015).

38. Defendant was well aware that other DFS companies' employees were playing on its platform, just as its own employees played on other DFS platforms. Defendant's employees have won at least $6,000,000 playing at FanDuel in the past few years. This number was calculated by FanDuel within a few days of the unfolding controversy, demonstrating these companies' ability to quickly identify competitors' employees.

39. Defendant was aware that some of its employees made more money from winnings on FanDuel than their DraftKings salaries paid them.

40. At all times prior to October 6, 2015, Defendant failed to disclose this material fact to Plaintiffs and the putative class.

41. As a result of the controversy, Defendant and FanDuel jointly decided to cease to allow competitors' employees to participate in their DFS contests. Defendant's CEO Jason Robins told Fortune magazine "[w]e've addressed the immediate issue, which is banning all employees from playing anywhere in the industry in public games. That's a big step. I think that honestly solves this issue, and while there are certainly additional safeguards to enforce that, I think if we can successfully enforce that, and we will, then that solves this issue."[7]

42. Defendant's CEO Jason Robins admits to the effect of the specific inside information that DFS employees have access to and that its employee leaked during NFL week 3.

43. Appearing on ESPN's "Outside the Lines" television program, the following exchange occurred:

---

[7] http://fortune.com/2015/10/08/draftkings-ceo-discusses-scandal/ (last accessed Oct. 15, 2015).

[**Host Bob Ley**]: "If someone had access to that internal player data – how many players were bought at what percentages – will you admit and tell us that it is important information to have that gives you a professional player, a shark, an advantage?"

[**DraftKings CEO Jason Robins**]: "Oh, of course. I mean any information like that would give people an advantage. It's not going to be enough to ensure absolute victory but if it's information that other's don't have and it pertains to the game then absolutely."[8]

44.     Asked by a reporter why DraftKings had not banned competitors' employees from participating in its contests sooner, DraftKings' CEO responded: "[c]ertainly we may have been late to the game on the employee ban—and hindsight 20/20, that's something I admit we should have done before. "[9]

45.     Mr. Robins and Defendant had the opportunity to consider this situation beforehand, however, not merely as the product of hindsight. Robins admitted that before the scandal erupted, he "had reservations" about allowing DFS employees to play on competing platforms, and even spoke to his competitors about ending the practice. Robins stated that "I, to be honest, did have some reservations about this, and have spoken in the past with some of our competition about whether we should have policies [to prevent the practice] in place." [10] Yet he and Defendant allowed the practice to continue.

46.     Plaintiff Neil Haroldson deposited $100 into his DraftKings account on September 12, 2015.

---

[8] http://espn.go.com/video/clip?id=13830386 (last accessed Oct. 15, 2015).

[9] http://fortune.com/2015/10/08/draftkings-ceo-discusses-scandal/ (last accessed Oct. 15, 2015).

[10] http://www.betaboston.com/news/2015/10/07/draftkings-ceo-had-reservations-about-employees-playing-fantasy-sports-but-didnt-expect-uproar/ (last accessed Oct. 15, 2015).

47.     Plaintiff Neil Haroldson has participated in numerous contests on Defendant's platform. These contests have included those involving professional golf, auto racing, football, and hockey.

48.     Plaintiff Neil Haroldson participated in a GPP contest on Defendant's platform during week 3 of the NFL season and was awarded no prize.

49.     Plaintiff Aaron Schiro deposited $100 into his DraftKings account on September 2, 2015.

50.     Plaintiff Aaron Schiro has participated in numerous contests on Defendant's platform. These contests have included those involving professional mixed martial arts, baseball, golf, and football. These contests generally involve tens or hundreds of thousands of entries, including one with more than five million entries.

51.     Plaintiff Aaron Schiro participated in GPP contests on Defendant's platform during week 3 of the NFL season and was awarded no prizes.

52.     Defendant's website contains terms and conditions that it seeks to apply to the users of its platform, which users may be required to acknowledge but not view before participating in Defendant's contests. These terms and conditions do not contain a valid, enforceable agreement that requires Plaintiffs to arbitrate the claims asserted herein.

## CLASS ALLEGATIONS

53.     Pursuant to Fed. R. Civ. P. 23, Plaintiffs request that this action be certified to proceed on behalf of the following classes:

**NFL Week 3 Class:**

> All persons in the United States who deposited money into a DraftKings account prior to September 27, 2015 and participated in any Guaranteed Prize Pool contest involving NFL games occurring between September 24, 2015 and September 28, 2015.

**Insider Trading Class**

> All persons in the United States who deposited money into a DraftKings account prior to October 6, 2015 and participated in any Guaranteed Prize Pool contest where one or more entries were made by any employee of any DFS platform who is confirmed to have had access to specific lineup information and/or usage rates.

54.     Excluded from the Class are (1) Defendant, its agents, subsidiaries, parents, successors, predecessors, and any entity in which it has a controlling interest, including those entities' current and former employees, officers, and directors, (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) Plaintiffs' counsel; (4) any person who has had their claims in this matter finally adjudicated and/or otherwise released; (5) any person who files a timely request for exclusion from the Class; (6) the legal representatives, successors, and assigns of any such excluded person.

55.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class as additional information is revealed in discovery and before the Court makes a determination on the propriety of class certification.

56.     Each class consists of thousands of individuals.

57.     Each class is therefore so numerous that joinder of all members would be impracticable.

58.     The identity of the class members is ascertainable. The identity of each class member can be determined from Defendant's business records.

59.     There exist numerous common questions of fact and law common to all class members.

60.     These common questions include, without limitation:

a)      Whether Defendant was contractually obligated to provide games of skill;

b)      Whether Defendant was contractually obligated to provide games that were objectively fair;

c)      Whether Defendant failed to prevent DFS employees with inside information from participating in its contests;

d)      Whether Defendant's failure to prevent DFS employees with inside information from participating in its contests constitutes a breach of any contract, express or implied;

e)      Whether Defendant was unjustly enriched through the collection and retention of portions of entry fees for contests that were inherently unfair;

f)      Which DFS employees participated in Defendant's contests;

g)      Whether each DFS employee who participated in Defendant's contests had inside information including access to specific lineups and/or usage rates;

h)      Which of Defendant's contests involved DFS employees with access to inside information;

i)      Whether Plaintiff and the putative class should be required to arbitrate their claims;

> j)     The proper measure and extent of damages caused by Defendant's acts; and
>
> k)     Whether Defendant violated Massachusetts and/or other state statutes thereby harming Plaintiffs and the putative class.

61.     The common questions of fact and law predominate over questions affecting only individual class members.

62.     Plaintiffs' claims are typical of the claims of the absent class members. Plaintiffs like all members of the NFL Week 3 Class, deposited money on Defendant's site and participated in contests for which inside information was leaked by Defendant's employee. Plaintiffs, like all members of the Insider Trading Class, deposited money on Defendant's site and participated in contests that were inherently unfair due to the participation of DFS employees with inside information.

63.     Plaintiffs will adequately represent the putative classes. They have the same claims and the same interest as the absent members of the putative classes.

64.     Plaintiffs have engaged the services of counsel experienced in complex and class action litigation. Through counsel, Plaintiffs will vigorously assert and represent the interests of the putative classes.

65.     The class action device is the best available means for the litigation of this action. Individual litigation of the claims of putative class members would be impracticable. Individual litigation would result in needless waste of resources of the parties and the Court and/or leave putative class members with no redress for their claims. If this case does not proceed as a class action, Defendant would be permitted to retain the proceeds it obtained through violations of the law.

66.     Based upon the experience of Plaintiffs' counsel, litigation of this case as a class action will be entirely manageable.

## COUNT I- INTENTIONAL MISREPRESENTATION

### On behalf of Plaintiffs and the Insider Trading Class

67.     Plaintiffs restate each of the allegations in this complaint as if set forth fully herein.

68.     Defendant made at least one false representation of material fact to Plaintiffs and the class.

69.     Specifically, Defendant made at least one false representation as to whether it offered games that were based on skill and therefore fair to participants.

70.     Defendant made the above false representation(s) with knowledge that said representation(s) were false.

71.     Defendant made the above false representation(s) for the purpose of inducing Plaintiffs and the class to act upon them.

72.     Plaintiffs and the class relied upon Defendant's false representation(s) as true, acted upon them, and were thereby damaged in an amount to be proven at trial.

## COUNT II- NEGLIGENT MISREPRESENTATION

### On behalf of Plaintiffs and the Insider Trading Class

73.     Plaintiffs restate each of the allegations in this complaint as if set forth fully herein.

74.     In the alternative to count I, Defendant made false representations to Plaintiffs and the putative class without knowledge of their falsity, but the truth was reasonably susceptible of actual knowledge.

75.    Defendant made at least one false representation as to whether it offered games that were based on skill and therefore fair to participants.

76.    Had Defendant acted with a modicum of diligence, accurate facts regarding the falsity of its representations would have been available and known to it.

77.    Defendant made the above false representation(s) for the purpose of inducing Plaintiffs and the class to act upon them.

78.    Plaintiffs and the class relied upon Defendant's false representation(s) as true, acted upon them, and were thereby damaged in an amount to be proven at trial.

## COUNT III- BREACH OF CONTRACT

### On behalf of Plaintiffs and the NFL Week 3 Class

79.    Plaintiffs restate each of the allegations in this complaint as if set forth fully herein.

80.    Defendant offered to provide fair games of skill to Plaintiffs and the putative class.

81.    Plaintiffs accepted Defendant's offer by depositing money and participating in games on Defendant's website and/or application along with the opportunity to win money in fair contests.

82.    Plaintiffs and the class offered their money as consideration, and Defendant offered the use of its platform.

83.    Defendant breached the contract it entered into with Plaintiffs and the putative class by failing to offer fair games of skill.

84.     Specifically, Defendant failed to protect its confidential insider information when its employee publicly broadcast that information across the internet, destroying the fairness and integrity of Defendant's Week 3 NFL contests.

85.     Plaintiffs and the class were damaged by Defendant's breach in an amount to be proven at trial.

## COUNT IV- BREACH OF CONTRACT

### On behalf of Plaintiffs and the Insider Trading Class

86.     Defendant offered to provide fair games of skill to Plaintiffs and the putative class.

87.     Plaintiffs accepted Defendant's offer by depositing money and participating in games on Defendant's website and/or application.

88.     Plaintiffs and the class offered their money as consideration, and Defendant offered the use of its platform along with the opportunity to win money in fair contests.

89.     Defendant breached the contract it entered into with Plaintiffs and the putative class by failing to offer fair games of skill.

90.     Specifically, Defendant failed to prohibit participants with inside information from participating in its contests, destroying the fairness and integrity of the Guaranteed Prize Pool contests in which the insiders participated.

91.     Plaintiffs and the class were damaged by Defendant's breach in an amount to be proven at trial.

## COUNT V- BREACH OF IMPLIED CONTRACT

### On behalf of Plaintiffs and the NFL Week 3 Class

92.     Plaintiffs restate each of the allegations in this complaint as if set forth fully herein.

93.     In the alternative to Count III, an implied in fact contract was formed between Plaintiffs (and the putative class) on one hand and Defendant on the other with respect to participation in Defendant's GPP contests.

94.     Defendant offered to enter into this agreement by accepting payment of entry fees for purported contests of skill.

95.     Plaintiffs and the class members accepted Defendant's offer by paying for and participating in Defendant's contests.

96.     An obligation arose for Defendant to provide fair games of skill.

97.     The parties intended to enter into an agreement whereby Defendant offered fair games of skill in which Plaintiffs and the putative class paid to become participants.

98.     Through their participation, Plaintiffs and the putative class performed all conditions required in accordance with the agreement to participate in the contests.

99.     Defendant willfully breached the agreement to provide fair games of skill when its employee publicly broadcast that information across the internet, destroying the fairness and integrity of Defendant's Week 3 NFL contests.

100.    Plaintiffs and the class were damaged by Defendant's breach in an amount to be proven at trial.

## COUNT VI- BREACH OF IMPLIED CONTRACT

### On behalf of Plaintiffs and the Insider Trading Class

101.    Plaintiffs restate each of the allegations in this complaint as if set forth fully herein.

102.    In the alternative to Count IV, an implied in fact contract was formed between Plaintiffs (and the putative class) on one hand and Defendant on the other with respect to participation in Defendant's GPP contests.

103.    Defendant offered to enter into this agreement by accepting payment of entry fees for purported contests of skill.

104.    Plaintiffs and the class members accepted Defendant's offer by paying for and participating in Defendant's contests.

105.    An obligation arose for Defendant to provide fair games of skill.

106.    The parties intended to enter into an agreement whereby Defendant offered fair games of skill in which Plaintiffs and the putative class paid to become participants.

107.    Through their participation, Plaintiffs and the putative class performed all conditions required in accordance with the agreement to participate in the contests.

108.    Defendant willfully breached the agreement to provide fair games of skill when it failed to prohibit participants with inside information from participating in its contests, destroying the fairness and integrity of the Guaranteed Prize Pool contests in which the insiders participated.

109.    Plaintiffs and the class were damaged by Defendant's breach in an amount to be proven at trial.

## <u>COUNT VII- NEGLIGENCE</u>

### On behalf of Plaintiffs and the NFL Week 3 Class

110.    Plaintiffs restate each of the allegations in this complaint as if set forth fully herein.

111.    Defendant owed duties to Plaintiffs and the putative class, who were paying customers and users of Defendant's DFS platform, to use reasonable care to provide fair contests of skill and to provide accurate and reliable information regarding those contests.

112.    Defendant breached its duties to Plaintiffs and the class when its agent publicly tweeted sensitive usage rate information, destroying the integrity of its week 3 NFL contests.

113.    The fact that Defendant's week 3 NFL contests would be rendered unfair and that Plaintiffs and the putative class would be harmed thereby was easily foreseeable.

114.    As a direct and proximate result of Defendant's negligence, Plaintiffs and the class were damaged in an amount to be proven at trial.

## COUNT VIII- NEGLIGENCE

### On behalf of Plaintiffs and the Insider Trading Class

115.    Plaintiffs restate each of the allegations in this complaint as if set forth fully herein.

116.    Defendant owed duties to Plaintiffs and the putative class, who were paying customers and users of Defendant's DFS platform, to use reasonable care to provide fair contests of skill and to provide accurate and reliable information regarding those contests.

117.    Defendant breached its duties to Plaintiffs and the putative class by failing to prevent individuals with material, non-public DFS data from participating in its contests.

118.    Defendant and its agents supplied false information to Plaintiffs and the putative class.

119.    Plaintiff and the putative class justifiably relied upon the information supplied by Defendant and thereby engaged in business with Defendant, losing money as a result.

120.    Defendant failed to use reasonable care in communicating information about the ability of DFS employees to use material, non-public information to participate in its contests.

121.    Defendant failed to use reasonable care to exclude DFS employees with material, non-public information from participating in its contests.

122.    As a direct and proximate result of Defendant's negligence, Plaintiffs and the class were damaged in an amount to be proven at trial.

## COUNT IX: VIOLATIONS OF CHAPTER 93A

### On behalf of Plaintiffs and the NFL Week 3 Class

123.    Plaintiffs restate each of the allegations in this complaint as if set forth fully herein.

124.    Plaintiffs intend to assert a claim under G.L. c. 93A, which makes it unlawful to engage in any "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." G.L. c. 93A, § 2(a). Plaintiffs have made a demand in satisfaction of G.L. c. 93A, § 9(3), and will amend this Complaint to assert claims under Chapter 93A once the required 30 days have elapsed. This paragraph is included for purposes of notice only and is not intended to assert a claim under Chapter 93A. By way of notice, DraftKings' unfair and deceptive promises to offer fair games, and other associated practices, violate Chapter 93A. DraftKings violated the Attorney General's regulations including but not limited to: 940 C.M.R. 3.02, False Advertisement; 3.03, Deceptive Advertising of Guarantees; 3.05, General Misrepresentations; 3.16, General Provisions; and 6.08, Prizes.

## COUNT X: VIOLATIONS OF CHAPTER 93A

### On behalf of Plaintiffs and the Insider Trading Class

125.    Plaintiffs restate each of the allegations in this complaint as if set forth fully herein.

126.    Plaintiffs intend to assert a claim under G.L. c. 93A, which makes it unlawful to engage in any "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." G.L. c. 93A, § 2(a). Plaintiffs have made a demand in satisfaction of G.L. c. 93A, § 9(3), and will amend this Complaint to assert claims under Chapter 93A once the required 30 days have elapsed. This paragraph is included for purposes of notice only and is not intended to assert a claim under Chapter 93A. By way of notice, DraftKings' unfair and deceptive promises to offer fair games, and other associated practices, violate Chapter 93A. DraftKings violated the Attorney General's regulations including but not limited to: 940 C.M.R. 3.02, False Advertisement; 3.03, Deceptive Advertising of Guarantees; 3.05, General Misrepresentations; 3.16, General Provisions; and 6.08, Prizes.

## COUNT XI: VIOLATIONS OF STATE CONSUMER PROTECTION LAWS

### On behalf of Plaintiffs and the NFL Week 3 Class

127.    Plaintiffs restate each of the allegations in this complaint as if set forth fully herein.

128.    Defendant's actions violate similar consumer protection laws enacted by states across the country.

129.    Defendant has engaged in deceptive practices by representing that its services have characteristics and benefits that they do not have.

130.    Defendant has represented that its services are of a particular standard, quality or grade, when they are of another.

131.    Defendant has advertised its services with intent not to sell them as advertised, and engaged in other conduct which similarly creates a likelihood of confusion and/or misunderstanding.

132.    Defendant's conduct as alleged herein constitutes unfair and/or deceptive trade practice predominantly and substantially affecting the conduct of trade or commerce throughout the United States, all in violation of the state deceptive trade practices acts and other similar state statutes that prohibit unfair and/or deceptive acts and practices.

133.    Defendant's conduct has directly, foreseeably, and proximately caused damages to Plaintiffs and the putative class in an amount to be determined at trial.

134.    As a direct, foreseeable, and proximate result of Defendant's violations of said laws, Plaintiffs and the putatative class have suffered actual injuries and damages for which Defendant is liable.

## COUNT XII: VIOLATIONS OF STATE CONSUMER PROTECTION LAWS

### On behalf of Plaintiffs and the Insider Trading Class

135.    Plaintiffs restate each of the allegations in this complaint as if set forth fully herein.

136.    Defendant's actions violate similar consumer protection laws enacted by states across the country.

137.    Defendant has engaged in deceptive practices by representing that its services have characteristics and benefits that they do not have.

138.    Defendant has represented that its services are of a particular standard, quality or grade, when they are of another.

139.    Defendant has advertised its services with intent not to sell them as advertised, and engaged in other conduct which similarly creates a likelihood of confusion and/or misunderstanding.

140.    Defendant's conduct as alleged herein constitutes unfair and/or deceptive trade practice predominantly and substantially affecting the conduct of trade or commerce throughout the United States, all in violation of the state deceptive trade practices acts and other similar state statutes that prohibit unfair and/or deceptive acts and practices.

141.    Defendant's conduct has directly, foreseeably, and proximately caused damages to Plaintiffs and the putative class in an amount to be determined at trial.

142.    As a direct, foreseeable, and proximate result of Defendant's violations of said laws, Plaintiffs and the putatative class have suffered actual injuries and damages for which Defendant is liable.

## COUNT XIII- UNJUST ENRICHMENT

### On behalf of Plaintiffs and the NFL Week 3 Class

143.    Plaintiffs restate each of the allegations in this complaint as if set forth fully herein.

144.    Plaintiffs and the class conferred a benefit upon Defendant by paying entry fees into its contests, a portion of each entry fee being retained by Defendant.

145.    Defendant knew of and appreciated the benefits it received from Plaintiffs and the class, as these entry fees constitute Defendant's primary revenue stream.

146.    Defendant accepted the entry fees while offering purported games of skill that were not fair or skill based, but allowed for the use of inside information to undermine the legitimate efforts of participants.

147.    It would be inequitable to allow Defendant to retain the benefit (entry fees) it obtained from Plaintiffs and the class given Defendant's failure to provide fair games of skill. Defendant must make restitution to Plaintiffs and the putative class.

## COUNT XIV- UNJUST ENRICHMENT

### On behalf of Plaintiffs and the Insider Trading Class

148.    Plaintiffs restate each of the allegations in this complaint as if set forth fully herein.

149.    Plaintiffs and the class conferred a benefit upon Defendant by paying entry fees into its contests, a portion of each entry fee being retained by Defendant.

150.    Defendant knew of and appreciated the benefits it received from Plaintiffs and the class, as these entry fees constitute Defendant's primary revenue stream.

151.    Defendant accepted the entry fees while offering purported games of skill that were not fair or skill based, but allowed for the use of inside information to undermine the legitimate efforts of participants.

152.    It would be inequitable to allow Defendant to retain the benefit (entry fees) it obtained from Plaintiffs and the class given Defendant's failure to provide fair games of skill. Defendant must make restitution to Plaintiffs and the putative class.

## RELIEF SOUGHT

WHEREFORE, Plaintiffs and the members of the proposed classes request the following relief and judgment against Defendant:

a.    An order certifying the proposed Classes, appointing Plaintiffs and their counsel to represent the classes, and requiring notice to the class to be paid by Defendant;

b.    An award of damages suffered by Plaintiffs and the proposed classes;

c.  An award of restitution to Plaintiffs and the proposed classes for all wrongfully obtained funds;

d.  Permanent injunctive relief requiring Defendant to cease and desist from engaging in the practices alleged herein;

e.  Such costs and fees as may be permitted by law;

f.  Pre- and post-judgment interest at the maximum allowable rate; and

g.  Such other relief arising in law and equity that this Court may deem appropriate under the law and circumstances, including but not limited to an award of punitive damages.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable and to the extent authorized by law.

Dated: October 15, 2015                    Respectfully submitted,


                                           **CULIK LAW PC**

                                           /s/ *Josef C. Culik*
                                           Josef C. Culik (BBO #672665)
                                           18 Commerce Way, Suite 2850
                                           Woburn, Massachusetts 01801
                                           (617) 830-1795
                                           jculik@culiklaw.com

                                           **LIDDLE & DUBIN, P.C.**
                                           Steven D. Liddle*
                                           Nicholas A. Coulson*
                                           975 E. Jefferson Avenue
                                           Detroit, Michigan 48207
                                           (313) 392-0025
                                           *Pro Hac Vice* to be submitted

                                           *Attorneys for Plaintiffs and the Putative Class*